# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| PAT NILSEN and JOHN NESSE, *as Trustees of the Carpenters and Joiners Welfare Fund and Twin City Carpenters Pension Master Trust Fund*; and DOMINIC ANDRIST and RICK BATTIS, *as Trustees of the Twin City Floor Covering Industry Pension Fund and Twin City Floor Industry Fringe Benefit Trust Fund, and each of their successors*, | Case No. 23-cv-676 (LMP/DJF) |
| Plaintiffs, | **ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| v. | |
| MASTER FLOORS OF MINNESOTA, INC.; DANIEL S. CARLSON; DANIEL S. CARLSON D/B/A/ MASTER FLOORS LLC; 1501 11TH AVENUE SOUTH, LLC; 670 CHARLES AVENUE LLC; 2300 ELLIOT AVENUE, LLC; MASTER FLOOR 2 LLC; DC NICOLLET DEVELOPMENT, LLC; 3948 OAKLAND AVENUE SOUTH, LLC; NEW LIFE ORGANIZATION, LLC; and NEW LIFE PROPERTIES, LLC, | |
| Defendants. | |

Angela R. Cefalu, Matthew David Barron, and Danielle E. Marocchi, **Reinhart Boerner Van Deuren S.C.**, **Minneapolis, MN**, for Plaintiffs.

Kevin D. Hofman, **Messerli & Kramer P.A.**, **Minneapolis, MN**, for Defendants.

Plaintiffs are the trustees and fiduciaries of welfare-benefit funds (the "Funds") that seek to recover unpaid fringe benefit contributions from Defendants[1] pursuant to the Employee Retirement Income Security Act ("ERISA"). *See* 29 U.S.C. § 1145. This matter is now before the Court on Plaintiffs' motion for summary judgment. ECF No. 37. For the following reasons, the Court grants in part and denies in part Plaintiffs' motion.

## FACTUAL BACKGROUND[2]

Defendant Daniel S. Carlson ("Carlson") is the owner of Defendants Master Floors of Minnesota, Inc. ("Master Floors"), DC Nicollet Development, LLC ("DC Nicollet"), and New Life Properties, LLC ("NLP"). ECF No. 6 ¶ 4; ECF No. 43-1 at 25–26. On June 11, 2019, Master Floors agreed to be bound by the Collective Bargaining Agreement ("CBA") negotiated between the Minnesota Floorcovering Contractors Association and the North Central States Regional Council of Carpenters. *See* ECF No. 39-6.

The CBA contains two provisions relevant here. First, it contains an agreement between the Carpentry Contractors Association and the Minnesota Drywall and Plaster Association ("CCA Agreement"), which covers commercial carpentry work "traditionally performed by the Employers and assigned to employees under this Agreement or

---

[1] Plaintiffs only seek summary judgment against Defendants Master Floors of Minnesota, Inc., Daniel S. Carlson, DC Nicollet Development, LLC, and New Life Properties, LLC. *See* ECF No. 44 at 33–42. The Court therefore does not address the liability of any other defendant in this action. References to "Defendants" in this Order refer only to Defendants Master Floors of Minnesota, Inc., Daniel S. Carlson, DC Nicollet Development, LLC, and New Life Properties, LLC.

[2] This factual background includes only the undisputed facts in the summary-judgment record.

2

predecessor Agreements, anywhere within the geographical jurisdiction of this agreement."[3]  *Id.* at 7.  Second, the CBA contains the Floorcovering Addendum, which includes:

> The cutting, fabrication, fitting, installing, to be cemented, tacked, or otherwise applied to its base, wherever it may be on floors, walls, or countertops, any and all materials traditionally performed by Floorcoverers under this Addendum whether used as a decorative or as acoustical covering including the removal of existing and the preparation of said substrate, all accessories necessary for the application and completion of related project.

ECF No. 39-7 at 11.  Signatories to the CBA are required to pay fringe benefit contributions for carpentry and floorcovering work, which in turn support retirement benefits, health insurance coverage, and educational benefits for workers.  *See* ECF No. 39-6 at 16–20; ECF No. 39-7 at 13–14.  CBA signatories are required to pay these fringe benefits monthly to the Funds "for each hour worked by all employees covered by this [CBA]."  ECF No. 39-6 at 16.  CBA signatories are also required to complete fringe fund remittance reports on a monthly basis identifying the hours worked during that month and disclosing the amount due in fringe benefit contributions for that work.  *See id.*; ECF No. 42 ¶ 6.  If a CBA signatory does not timely provide its fringe benefit contributions and remittance reports, the signatory is considered "delinquent" and is required to pay liquidated damages and interest on the unpaid contributions.  ECF No. 39-6 at 17.

---

[3]     The "geographical jurisdiction" covered by the CCA Agreement includes various regions of Minnesota and Wisconsin.  ECF No. 39-6 at 7–8.

There is no dispute that Master Floors is bound to the terms of the CBA. And because Carlson signed the CBA for Master Floors, *see* ECF No. 39-7 at 23, there is no dispute that Carlson is individually bound to the CBA, *see id.* at 22 ("If this [CBA] is signed for or on behalf of a corporation, then the person signing the [CBA] not only binds the corporation but agrees to be bound individually to the full and faithful performance of all the terms and provisions of this [CBA].").

In addition to the CBA, Carlson also executed the "Carlson Addendum" on June 11, 2019. *See* ECF No. 39-5. The Carlson Addendum imposed additional conditions on Carlson's participation in the CBA "[d]ue to [Carlson's] repeated violations of the Agreement and difficulties in cooperating with fringe fund collections and auditors." *Id.* at 2. Relevant here, Carlson agreed "that any other entity in which he owns at least 25% shall be bound to the [CBA] for all covered work." *Id.* at 3. Because Carlson owns at least 25% of DC Nicollet and NLP, it is undisputed that DC Nicollet and NLP are also bound to the terms of the CBA. ECF No. 43-1 at 25–26.

In late 2022, union representatives began to suspect that Master Floors had failed to pay and report fringe benefit contributions required under the CBA. ECF No. 39 ¶¶ 18–25. On December 14, 2022, an auditor from the Funds' administrator requested records from Master Floors to verify the accuracy of Master Floors's fringe benefit contributions. ECF No. 48. By March 2023, neither Master Floors nor Carlson produced the requested documents. ECF No. 42 ¶ 16. At this point, Carlson had only reported hours worked for himself during 2022, but no other employees. *Id.* ¶ 17.

Plaintiffs therefore commenced this action on March 21, 2023, seeking to compel an audit under ERISA, 29 U.S.C. § 1145, and for damages in the amount of fringe benefit contributions due, liquidated damages, interest, attorneys' fees, and costs. *See generally* ECF No. 1.

During discovery in this action, Carlson provided the Funds' auditor with invoices, Forms 1099, and bank account records. ECF No. 42 ¶¶ 20, 22, 25, 28, 31–32, 38, 41. However, Carlson openly admitted that he was a poor recordkeeper, ECF No. 49 ¶ 5, and the audit was complicated by the fact that Master Floors, DC Nicollet, and NLP did not use a payroll system, did not produce any payroll summaries, did not produce individual earning records, and claimed that they did not maintain timecards, ECF No. 42 ¶ 18.

Ordinarily, the Funds' auditor must review the records provided by the employer to determine the type of work performed by each employee in order to calculate the number of hours worked by that individual and the amount of fringe benefits due. *Id.* ¶¶ 12–13. However, when an employer fails to provide adequate documentation regarding the type of work performed by an employee, the Funds' audit policy states that the employee is presumed to have been engaged in covered work under the CBA. ECF No. 42-4 at 4. Moreover, if the employer fails to provide adequate documentation showing the actual number of hours worked by individuals performing covered work, then the audit policy allows the auditor to make reasonable estimates based on the records provided. *Id.* at 4–5.

Based on the records provided by Defendants in this action, the Funds' administrator conducted an audit for the period of January 1, 2022, to December 31, 2023, and

determined that Master Floors, DC Nicollet, NLP, and Carlson were responsible for unpaid fringe benefit contributions. *See* ECF No. 42 ¶¶ 19–37.

**Master Floors:** Master Floors did not produce employee timecards or any contemporaneous records evidencing hours worked by employees. *Id.* ¶ 21. Master Floors did, however, produce Forms 1099, which the auditor analyzed to determine that Master Floors owes the Funds $29,740.61 in unpaid fringe benefit contributions. *Id.* Specifically, the auditor calculated the number of hours worked by Master Floors employees by dividing the payments issued on the Forms 1099 by the applicable journeyman rate. *Id.*

The audit also discovered that Master Floors performed work for a supply house called "Value Plus Flooring." *Id.* ¶ 22. Although Master Floors was unable to provide timecards or any records reflecting the hours worked by employees, the auditor was able to review invoices and payments produced by Value Plus Flooring. *Id.* ¶ 23. The auditor concluded from these invoices that Master Floors owed $460,780.77 in unpaid fringe contributions for the Value Plus Flooring projects. *Id.* ¶ 24. The auditor excluded from her fringe benefit calculation any invoice line-items that referenced charges for materials, not labor. *Id.* ¶ 23.

The audit also discovered that Master Floors performed work for a company called "Blackhawk Tile." *Id.* ¶ 25. Although Master Floors was unable to provide timecards or any records reflecting the hours worked by employees, the auditor was able to review invoices issued to Blackhawk Tile. *Id.* ¶ 25–26. The auditor concluded from these invoices that Master Floors owed $9,866.38 in unpaid fringe contributions for the Blackhawk Tile

projects. *Id.* ¶ 27. The auditor excluded from her fringe benefit calculation any invoice line-items that referenced charges for materials, not labor. *Id.* ¶ 26.

In sum, the auditor concluded that Master Floors owed $500,387.76 in unpaid fringe contributions.

**DC Nicollet:** Master Floors employees also performed work for another of Carlson's companies, DC Nicollet. ECF No. 43-1 at 25. Neither Master Floors nor DC Nicollet kept records of hours worked by employees on DC Nicollet projects. *Id.* The auditor therefore reviewed checks issued to employees by DC Nicollet and check detail reports showing payments issued by DC Nicollet. ECF No. 42 ¶¶ 28–29. The auditor concluded from these checks and check detail reports that DC Nicollet owes $331,778.85 in unpaid fringe contributions. *Id.* ¶ 30.

**NLP:** Carlson also issued payments to workers on projects for his other company, NLP. *Id.* ¶¶ 31–32. NLP did not produce payroll records or timecards to show the hours or type of work being performed by individuals working on NLP projects. *Id.* ¶ 33. Accordingly, the auditor reviewed the Forms 1099 issued to workers by NLP and concluded that NLP owes $1,397,263.46 in unpaid fringe contributions. *Id.* ¶ 37. The auditor removed certain hours from the fringe benefit calculation after certain employees testified during this action that they did not perform covered work. *Id.* ¶ 35.

In addition to Master Floors, DC Nicollet, and NLP, the auditor reviewed documents from two other entities related to Carlson: New Life Gardens LLC ("NLG") and Up We Go LLC ("UWG"). *See id.* ¶¶ 38–43.

**NLG:** NLG is a limited liability company wholly owned by NLP (which in turn is wholly owned by Carlson). ECF No. 43-1 at 26. NLG paid workers for an apartment project in Minneapolis. *Id.* The auditor reviewed a bank transactions spreadsheet and copies of checks issued to workers and sub-contractors by NLG. ECF No. 42 ¶¶ 38–40. From these documents, the auditor concluded that NLG owes $83,787.29 in unpaid fringe contributions. *Id.* ¶ 40.

**UWG:** UWG is a limited liability company wholly owned by NLP (which in turn is wholly owned by Carlson). ECF No. 44 at 41; ECF No. 50 at 17. The auditor reviewed bank statements and a bank transactions spreadsheet from UWG and concluded that payments were made to workers engaged in covered work who were not included on NLP's Forms 1099. ECF No. 42 ¶¶ 41–42. The auditor concluded that UWG owes $51,803.15 in unpaid fringe contributions. *Id.* ¶ 43.

### Procedural Posture

Plaintiffs now move for summary judgment, seeking an award of damages in the amount of the auditor's calculations of unpaid fringe contributions for Master Floors, DC Nicollet, NLP, NLG, and UWG.[4] *See generally* ECF No. 37. Plaintiffs also seek liquidated damages, interest, attorneys' fees, and costs. *Id.*

In response, Carlson first argues that he cannot be liable for the unpaid fringe contributions of NLG and UWG because NLP—not Carlson—owns those entities. ECF No. 50 at 16–18. As for the unpaid fringe contributions of Master Floors, DC Nicollet, and

---

[4]     Although Plaintiffs requested in their complaint that the Court compel an audit, ECF No. 1 ¶¶ 38–44, 49–55, Plaintiffs no longer seek that remedy in their motion.

NLP, Carlson concedes that those entities owe unpaid fringe contributions but disputes the auditor's calculation of those contributions. *Id.* at 8–15.

## ANALYSIS

Summary judgment is proper only if "there is no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Riedl v. Gen. Am. Life Ins.*, 248 F.3d 753, 756 (8th Cir. 2001) (citation omitted) (internal quotation marks omitted). At this procedural juncture, this Court does "not weigh the evidence, make credibility determinations, or attempt to discern the truth of any factual issue." *Avenoso v. Reliance Standard Life Ins. Co.*, 19 F.4th 1020, 1024 (8th Cir. 2021) (citation omitted) (internal quotation marks omitted). Additionally, the Court must view the facts in the light most favorable to the non-moving party. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). To assert that a fact is or is not genuinely disputed, a party "must support the assertion by . . . citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A).

### I.     Carlson's Liability for NLG's and UWG's Unpaid Fringe Contributions

The parties dispute the application of the following provision in the Carlson Addendum to NLG's and UWG's liability for unpaid fringe contributions:

> If this [CBA] is signed for or on behalf of a corporation, then the person signing the [CBA] not only binds the corporation but agrees to be bound individually to the full and faithful performance of all terms and provisions of this [CBA]. Dan Carlson agrees that any other entity in which he owns at least 25% shall be bound to the [CBA] for all covered work.

ECF No. 39-5 at 3.  Defendants are correct that the second sentence of this provision cannot impose liability on Carlson for NLG and UWG.  It is undisputed that NLP—not Carlson—owns 100% of NLG and UWG.  ECF No. 43-1 at 26.  Carlson does not "own[] at least 25%" of those entities, ECF No. 39-5 at 3, and those entities are therefore not bound to the CBA by virtue of the second sentence of this provision.  Indeed, Plaintiffs hedge their argument by stating that NLG and UWG are "arguably bound" to the CBA.  ECF No. 44 at 41.  But "arguably bound" does not mean "bound" under ERISA, for only an employer "who is obligated," not *arguably* obligated, "to make contributions to a multiemployer plan . . . under the terms of a collectively bargained agreement" is required to do so.  29 U.S.C. § 1145.

The first sentence of this provision in the Carlson Addendum presents a closer question, however.  That sentence bound Carlson "individually to the full and faithful performance of all terms and provisions of this [CBA]."  ECF No. 39-5 at 3.  However, under this provision, Carlson only bound himself to pay contributions under the terms and provisions of the *CBA*.  And it is the Court's role to uphold the primacy of that written plan so that beneficiaries receive what is due under the plan—no more and no less.  *See Admin. Comm. of Wal-Mart Stores, Inc. Assocs.' Health & Welfare Plan v. Shank*, 500 F.3d 834, 839 (8th Cir. 2007).

Here, although Master Floors, DC Nicollet, and NLP were parties to the CBA, *see* ECF No. 39-5 at 3; ECF No. 39-7 at 23, NLG and UWG are not.  Given that NLG and UWG were not parties to the CBA (the document by which Carlson agreed to abide), Carlson cannot be held liable for breaching the terms and provisions of the CBA with

10

respect to NLG and UWG.  In ERISA-speak, because Carlson was not bound by the "terms of a collectively bargained agreement" to make contributions for NLG and UWG, he is not required to do so.  29 U.S.C. § 1145.  Plaintiffs' cited case law does not help their position, as it establishes only that an employer *who is bound to the terms of a CBA* cannot use non-union subcontracting in violation of a CBA.  *See Chi. Painters & Decorators Pension, Health & Welfare, & Deferred Sav. Plan Trust Funds v. Karr Bros., Inc.*, 755 F.2d 1285, 1288–89 (7th Cir. 1985) (employer who violated non-union subcontracting provision of a CBA was party to the CBA); *Trs. of Minn. Ceramic Tile & Allied Trades Ret. Fund v. Legacy Tile & Marble, Inc.*, No. 06-cv-2965 (JNE/SRN), 2008 WL 624120, at *5–6 (D. Minn. Mar. 4, 2008) (same).

Plaintiffs also argue that Carlson breached the CBA's prohibition against non-union subcontracting by "utili[zing] these companies to pay individuals outside of the union contract."  ECF No. 44 at 41; ECF No. 55 at 3–4 ("Plaintiffs' motion requests that the judgment be entered against Dan Carlson, individually and d/b/a Master Floors for Carlson . . . paying non-union subcontractors to perform covered work through NLG ($97,730.21) and UWG ($60,423.76)").  But as Plaintiffs recognize, Carlson did not employ or pay these workers individually; rather, these workers were paid by NLG and UWG, entities which are not bound to the CBA.  ECF Nos. 42-19, 42-21.  Absent a contractual recognition that Carlson is personally liable for NLG's and UWG's obligations, the law recognizes the "legal fiction of the separate corporate entity."  *Greater Kan. City Laborers Pension Fund v. Superior Gen. Contractors, Inc.*, 104 F.3d 1050, 1055 (8th Cir. 1997).  Put simply, this means the acts of NLG and UWG are not automatically imputed to Carlson.  Indeed,

"unless the corporate veil is pierced," an officer or member "of a limited liability company is protected from personal liability for the company's acts, debts, liability, and obligations." *Krueger v. Zeman Constr. Co.*, 758 N.W.2d 881, 890 (Minn. Ct. App. 2008).[5]

Given the entangled relationships between Carlson's various entities, Plaintiffs may have a decent argument that NLG and UWG are alter egos of Carlson, such that the corporate veils of those entities should be pierced. *See Johnson v. Charps Welding & Fabricating, Inc.*, 950 F.3d 510, 520–21 (8th Cir. 2020) (describing application of the alter ego doctrine in an ERISA Section 515 case). But Plaintiffs do not argue for application of the alter ego doctrine here; rather, their sole argument is premised on the text of the CBA.[6] Because the language of the CBA does not impose liability on Carlson for the acts of NLG and UWG, the Court denies summary judgment as to liability for NLG and UWG.

## II.    Calculation of Unpaid Fringe Contributions

Having resolved the liability of NLG and UWG, the Court now turns to resolving the parties' disputes regarding the amount of unpaid fringe contributions owed by Master Floors, NLP, and DC Nicollet.

---

[5]    Whether to pierce the corporate veil "is a legal determination that, in our circuit, is governed by state law." *Stoebner v. Lingenfelter*, 115 F.3d 576, 579 (8th Cir. 1997).

[6]    At oral argument, Plaintiffs suggested a different theory of liability: because NLP is the owner of NLG and UWG, and because NLP is bound to the CBA by virtue of the Carlson Addendum, NLP is liable for NLG's and UWG's obligations. Because that argument was not presented in Plaintiffs' summary-judgment briefing, the Court does not consider it. *See Anderson v. Rugged Races LLC*, 496 F. Supp. 3d 1270, 1285 n.11 (D. Minn. 2020).

Section 515 of ERISA governs claims of non-payment with respect to fund contributions. *See* 29 U.S.C. § 1145. Congress enacted Section 515 to "simplify actions to collect delinquent contributions, avoid costly litigation, and enhance the actuarial planning necessary to the administration of multiemployer pension plans." *Cent. States, Se. & Sw. Areas Pension Fund v. Indep. Fruit & Produce Co.*, 919 F.2d 1343, 1348 (8th Cir. 1990).

Here, there is no dispute that employees for Master Floors, DC Nicollet, and NLP engaged in some covered work for which fringe contributions were unpaid. Rather, the parties dispute the amount of that covered work for which contributions are due: Plaintiffs argue that the audit's calculations are reasonable and accurate, while Defendants challenge the auditor's assumptions and calculations.

Completion of the audit was complicated by Carlson's admittedly poor recordkeeping. Under ERISA, employers are to maintain employee records that are "sufficient to determine the benefits due or which may become due to such employees." 29 U.S.C. § 1059(a)(1). And Carlson agreed in the Carlson Addendum that he would "maintain clearly accessible and organized records for auditing and collection purposes." ECF No. 39-5 at 3. By his own admission, Carlson did not do so. ECF No. 49 ¶ 5.

In such cases, courts in this District "agree that employers should not be able to avoid contribution payment obligations by failing to keep adequate records." *Reed v. Insituform Techs., Inc.*, 994 F. Supp. 2d 1022, 1031 (D. Minn. 2014) (collecting cases). From this principle, a burden-shifting rule has emerged:

> If a benefit fund meets its initial burden of (1) showing that an employer
> engaged in some covered work and failed to produce adequate records of that
> work and (2) providing a calculation of the contributions owed by the
> employer, the burden shifts to the employer, which must put forth evidence
> challenging the benefit fund's calculation.

*Bigham v. R&S Heating & Air Conditioning, Inc.*, 182 F. Supp. 3d 919, 923 (D. Minn.

2016).

Defendants do not contest that Plaintiffs have met their burden to show that

Defendants engaged in some covered work, failed to produce adequate records of that

work, and that Plaintiffs have provided a calculation of the contributions owed by the

employer. *See* ECF No. 50 at 18–20. Therefore, to escape summary judgment, Defendants

must meet their burden to put forth evidence challenging the auditor's calculations. *See*

*Bigham*, 182 F. Supp. 3d at 923.

Determining exactly *how much* evidence Defendants must put forth to meet its

burden is not a precise science. On one hand, Defendants must do more than provide

"conclusory" arguments against the auditor's calculations. *Id.* at 924; *see Plumbers Loc. 98*

*Defined Benefit Pension Fund v. M & P Master Plumbers of Mich., Inc.*, 608 F. Supp. 2d

873, 881 (E.D. Mich. 2009) (holding that the employer failed to meet its burden when its

affidavit "regarding the nature of the work for each of the individual workers" was

conclusory and "insufficient to establish an issue of material fact"); *Cement & Concrete*

*Workers Dist. Council Welfare Fund v. Superior Gunite*, 742 F. Supp. 3d 309, 319

(E.D.N.Y. 2024) (holding that a defendant could not meet its burden with "vague

assertions" questioning the accuracy of an audit). On the other hand, a defendant may meet

its burden by providing "evidence of specific facts that call the accuracy of the audit into

14

question." *Bigham*, 182 F. Supp. 3d at 924; *see Sheet Metal Workers' Health & Welfare Fund of N.C. v. Stromberg Metal Works, Inc.*, 118 F.4th 621, 637 (4th Cir. 2024) (defendant met burden by identifying "computational and methodological errors in the Funds' third-party audit").

With this framework in mind, the Court turns to evaluating whether Defendants have met their burden with respect to each of the entities alleged to owe unpaid fringe contributions.

### a. Master Floors

Defendants first summarily contend that the auditor should have used Master Floors's pay rate of $45 per hour to calculate the number of hours worked. ECF No. 50 at 9. The $45-per-hour figure is ostensibly derived from Master Floors's Forms 1099, ECF No. 49-1, but upon review of the underlying Forms 1099, ECF No. 42-7, the Court is unable to discern how Master Floors has calculated its $45-per-hour rate. Master Floors's "vague assertion[]" that it paid floorers $45 per hour—a figure that is not corroborated by Master Floors's own Forms 1099—does not present a genuine dispute of material fact as to the accuracy of the auditor's hours calculation. *Superior Gunite*, 742 F. Supp. 3d at 319.

Defendants next dispute Master Floors's unpaid fringe contributions for the Value Plus Flooring and Blackhawk Tile projects. ECF No. 50 at 9–11. Defendants first argue that the auditor included costs for materials in her benefit estimates, but the auditor explicitly states that she excluded from her fringe benefit calculation any invoice line-items that referenced charges for materials, not labor. ECF No. 42 ¶¶ 24, 26. Defendants do not offer any explanation of which invoice items purportedly contain materials charges, rather

than labor charges.  Defendants' allegation that the auditor included materials charges is entirely conclusory and fails to meet their burden to avoid summary judgment.  *Bigham*, 182 F. Supp. 3d at 924.

Defendants finally protest that the auditor should have divided the total invoice amounts by $100 to arrive at the number of hours worked because Master Floors typically makes $100 of profit per hour on time and material work.  ECF No. 50 at 9–11.  Defendants' only support for the $100 figure is Carlson's deposition testimony, in which he states, "I would say basically we make $100 an hour.  I like round numbers."  ECF No. 43-1 at 20. That vague testimony falls far short of providing "evidence of specific facts that call the accuracy of the audit into question."  *Bigham*, 182 F. Supp. 3d at 924.

Because Defendants have failed to put forth evidence that creates a genuine dispute of material fact challenging the auditor's calculation for Master Floors's unpaid fringe contributions, summary judgment for Plaintiffs is appropriate against Master Floors in the amount of $496,643.36.[7]

**b.  NLP**

Defendants assert that the auditor erroneously included contributions for employees who did not engage in covered work under the CCA Agreement in her calculation of NLP's unpaid fringe contributions.  ECF No. 50 at 12–14.  The CCA Agreement defines covered carpentry work as work "traditionally performed by the Employers and assigned to

---

[7]    After oral argument, the parties agreed to remove $3,744.40 in contributions for an employee who did not engage in covered work.  ECF No. 58.  This amount therefore represents the auditor's calculation of Master Floors's unpaid fringe contributions, minus $3,744.40 in unpaid contributions for that employee.  ECF No. 42-8 at 2.

employees under this Agreement or predecessor Agreements, anywhere within the geographical jurisdiction of this agreement."  ECF No. 39-6 at 7.  Plaintiffs offer the testimony of union representative Jeffrey Peterson, who states that carpentry work "traditionally performed" under the CCA Agreement means "the building of concrete forms, installation of drywall, installing countertops, exterior framing and interior framing, exterior sheathing, vapor barriers, installing insulation, exterior siding (including trim), interior trim, hanging doors and windows, cabinetry, and building scaffolding."  ECF No. 39 ¶ 16.  It appears that the auditor interpreted the scope of the CCA Agreement similarly.  *See* ECF No. 42 ¶ 29 (interpreting covered work as including "drywall, concrete forming, and countertops").

Faced with Plaintiffs' interpretation of the scope of the CCA Agreement and the auditor's conclusion that the employees at issue engaged in covered work, Defendants must "cit[e] to particular parts of materials in the record" to establish a genuine dispute as to the scope of the CCA Agreement.  Fed. R. Civ. P. 56(c)(1)(A).  Defendants first dispute Peterson's interpretation of the CCA Agreement by pointing to narrower definitions of "carpentry" offered by the Bureau of Labor Statistics ("BLS") and the Office of Management and Budget ("OMB").  ECF No. 50 at 12–13.  But these definitions— provided only in Defendants' memorandum of law—are not part of the summary-judgment record.  *See Wittenburg v. Am. Express Fin. Advisors, Inc.*, 464 F.3d 831, 838 (8th Cir. 2006) ("[A]rguments of counsel are not evidence.").  That rule makes good sense here, as an attorney, no matter how skilled, is unlikely to understand the nuances of what type of carpentry work is "traditionally performed" by employees governed by the CCA

Agreement in the specific geographical jurisdiction governed by that agreement. *See* ECF No. 39-6 at 7.

Moreover, it is not clear how the BLS and OMB definitions are even relevant to interpretation of the CCA Agreement. The CCA Agreement defines covered work as that work "traditionally performed by the Employers and assigned to employees under this Agreement or predecessor Agreements, anywhere within the geographical jurisdiction of this agreement." *Id.* But the BLS and OMB definitions are national definitions; they do not purport to define carpentry work "traditionally performed" by Minnesota and Wisconsin carpenters governed by the CCA Agreement. *See id.* at 39-6 at 7–8 (defining the geographical jurisdiction of the CCA Agreement as various regions of Minnesota and Wisconsin). The BLS and OMB definitions cannot create a genuine dispute of material fact as to the scope of the CCA Agreement when those definitions are not tied to the specific definition of carpentry work contained in the CCA Agreement. The Court therefore disregards the BLS and OMB definitions in ruling on Plaintiffs' summary-judgment motion.

The only evidence in the summary-judgment record to which Defendants cite to challenge the auditor's findings is a declaration exhibit offered by Carlson, in which he states which employees engaged in covered work and which employees did not. ECF No. 49-4. But an employer's bald assertion that certain employees did not engage in covered work, standing alone, does not meet the employer's burden at summary judgment under the burden-shifting framework to provide "evidence of specific facts that call the accuracy of the audit into question." *Bigham*, 182 F. Supp. 3d at 924; *see Laborers' Pension*

18

*Fund v. RES Env't Servs., Inc.*, 377 F.3d 735, 739 (7th Cir. 2004) (third alteration in original) (holding that an employer's affidavit which "identifie[d] five employees and state[d] that they 'performed work not covered by the [CBA]'" failed to meet the employer's burden at summary judgment); *Bds. of Trs. of Ohio Laborers' Fringe Benefit Programs v. Jenkins*, 283 F. App'x 315, 319 (6th Cir. 2008) (holding that an employer's and bookkeeper's "conclusory" affidavits stating that "contributions were not due for work performed by non-laborer 'policemen[]' did not generate a question of material fact"); *Plumbers Loc. 98*, 608 F. Supp. 2d at 881 (holding that the employer's "statements in his affidavit, regarding the nature of the work for each of the individual workers, without more are insufficient to establish an issue of material fact"); *Trs. of Chi. Painters v. Destiny Decorators, Inc.*, No. 07 C 4236, 2009 WL 3188687, at *7–8 (N.D. Ill. Sept. 30, 2009) (employer's vague, unsupported assertion that it was not required to pay contributions for certain employees failed to meet the employer's burden).

Defendants' evidence of the auditor's purported miscalculations—which essentially amounts to Carlson's conclusory assertion that certain employees did not engage in covered work—similarly does not meet NLP's burden to provide "evidence of specific facts that call the accuracy of the audit into question." *Bigham*, 182 F. Supp. 3d at 924. Unlike Plaintiffs, Defendants did not cite to the testimony of a union representative, laborer, or other qualified person to illuminate the scope and understanding of what constitutes carpentry work "traditionally performed" by workers under the CCA Agreement. Indeed, neither Carlson nor NLP point to a competing definition of carpentry work "traditionally performed" under the CCA Agreement in the summary-judgment record. Such a definition

19

may have offered evidentiary support to Carlson's identification of certain employees that he considers having engaged in noncovered work. Absent that evidence, however, all that remains is Carlson's bald, conclusory assertion that certain employees did not engage in covered work. That evidence is insufficient for NLP to avoid summary judgment. *See id.*

NLP argues that this case is like *Bigham* and *Reed*, ECF No. 50 at 18–19, but those cases are readily distinguishable. In *Bigham*, the Court withheld summary judgment for the plaintiffs because the employer challenged the auditor's calculations by "submit[ting] expert testimony pointing out deficiencies in the audit report, as well as an alternate calculation of benefit contributions." *Id.* Here, Carlson's bald assertions of inaccuracy fall far short of *expert* testimony identifying specific calculation errors in the audit.

In *Reed*, the Court withheld summary judgment for the plaintiffs because "[w]hether [the employer's] records [were] sufficient and accurate [was] in dispute," and therefore, "the question of the hours for which [the employer] must pay contributions [was] also in dispute." 994 F. Supp. 2d at 1031. Here, there is no dispute whether NLP's records are sufficient and accurate—Carlson agrees that they are not. ECF No. 49 ¶ 5.

Because Defendants have failed to put forth evidence that creates a genuine dispute of material fact challenging the auditor's calculation for NLP's unpaid fringe contributions, summary judgment for Plaintiffs is appropriate against NLP in the amount of $1,397,263.46.

### c. DC Nicollet

Defendants advance two arguments challenging the auditor's calculation of unpaid fringe contributions by DC Nicollet. First, Defendants assert that the calculation of unpaid

fringe benefits for DC Nicollet are "duplicative of the NLP Form[s] 1099 benefit estimation."  ECF No. 50 at 14.  Defendants offer little elaboration on this argument, and it is unclear why those benefit estimations are "duplicative."  Other than their conclusory assertion, Defendants offer no evidence showing that the auditor's benefit calculation for DC Nicollet included hours already encompassed by NLP's workers.  Defendants' vague assertion that the auditor's calculation of DC Nicollet's unpaid fringe contributions was "duplicative" of NLP's fails to put forth evidence that creates a genuine dispute of material fact. *See Bigham*, 182 F. Supp. 3d at 924.

Second, Defendants reiterate their argument that the auditor erroneously included employees who performed uncovered work in her calculation of DC Nicollet's unpaid fringe contributions for covered carpentry work.  ECF No. 50 at 14–15.  This argument parallels the argument Defendants made with regard to NLP, and the Court similarly concludes that Defendants have not raised a genuine dispute of material fact as to the amount of unpaid fringe contributions for which DC Nicollet is liable.  The Court therefore grants summary judgment against DC Nicollet in the amount of $331,778.85.

To summarize, the Court grants summary judgment for Plaintiffs in the following amounts: $496,643.36 against Master Floors; $1,397,263.46 against NLP; and $331,778.85 against DC Nicollet.  And, because Carlson is "bound individually" to the CBA for the obligations of these entities, ECF No. 39-5 at 3, the Court holds that Carlson is jointly and severally liable for these unpaid obligations in the amount of $2,225,685.67.[8]

---

[8]    Carlson does not dispute that he is jointly and severally liable for the unpaid fringe contributions of Master Floors, NLP, and DC Nicollet.

### d. Liquidated Damages and Interest

Plaintiffs also request liquidated damages and interest, pursuant to the terms of the CBA. The CBA provides that "[a]n Employer who is delinquent and has unpaid contributions shall be required to pay to the Funds an additional amount of 10% of the amount of the unpaid contributions as liquidated damages." ECF No. 39-6 at 17. The CBA and the Trust Agreements for the Funds also provide that the delinquent employer owes interest on the unpaid contributions at the rate prescribed by 26 U.S.C. § 6621 (as the auditor explains, 8% beginning January 1, 2024, through October 29, 2024). *Id.*; ECF No. 42 ¶ 45; ECF No. 42-24.

Defendants do not dispute that Plaintiffs are entitled to liquidated damages, nor do they dispute that Plaintiffs are entitled to interest in the manner calculated by the auditor. Accordingly, based on the amount of unpaid fringe contributions on which the Court grants summary judgment for Plaintiffs, the Court awards liquidated damages to Plaintiffs as follows: as against Master Floors: $49,664.36 in liquidated damages and $32,982.56 in interest; as against NLP: $139,726.34 in liquidated damages and $92,793.61 in interest; and as against DC Nicollet: $33,177.88 in liquidated damages and $22,033.75 in interest.[9] And because Carlson is "bound individually" to the CBA for the obligations of these entities, ECF No. 39-5 at 3, the Court holds that Carlson is jointly and severally liable for these liquidated damages and interest in the amount of $370,378.50.

---

[9]    Plaintiffs only seek interest accrued during the period from January 1, 2024, to October 29, 2024. *See* ECF No. 44 at 43; ECF No. 42 ¶ 45.

**e. Attorneys' Fees and Costs**

Plaintiffs seek a determination from this Court that they are entitled to attorneys' fees. ECF No. 44 at 43–44. ERISA provides that in a Section 515 action "in which a judgment in favor of the plan is awarded, the court shall award the plan . . . reasonable attorney's fees and costs of the action, to be paid by the defendant." 29 U.S.C. § 1132(g)(2)(D). The use of "shall" means that when judgment in favor of a plan is awarded, an award of attorneys' fees and costs is mandatory. *Nesse v. Green Nature-Cycle, LLC*, No. 18-cv-636 (ECT/HB), 2020 WL 2848193, at *1 (D. Minn. June 2, 2020). Here, the Court is granting partial summary judgment in favor of the Plans, so an award of attorneys' fees and costs is mandatory under 29 U.S.C. § 1132(g)(2). Plaintiffs are invited to submit a motion detailing their reasonable attorneys' fees and costs, pursuant to Fed. R. Civ. P. 54(d).

## CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.    Plaintiffs' Motion for Summary Judgment (ECF No. 37) is **GRANTED IN PART AND DENIED IN PART** as follows:

      a.    Plaintiffs are entitled to summary judgment against Master Floors of Minnesota, Inc. in the amount of $579,290.28.

      b.    Plaintiffs are entitled to summary judgment against New Life Properties, LLC in the amount of $1,629,783.41.

c.      Plaintiffs are entitled to summary judgment against DC Nicollet
Development LLC in the amount of $386,990.48.

d.      Daniel S. Carlson is jointly and severally liable for the judgments
against Master Floors of Minnesota, Inc., New Life Properties, LLC,
and DC Nicollet Development LLC, in the amount of $2,596,064.17.

e.      Plaintiffs are not entitled to summary judgment against New Life
Gardens LLC.

f.      Plaintiffs are not entitled to summary judgment against Up We Go
LLC.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: March 25, 2025                    *s/Laura M. Provinzino*
                                          Laura M. Provinzino
                                          United States District Judge